Lee v. McDowell, 2022 NCBC 28.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

KEITH LEE and YOUNG KWON (individually and derivatively on behalf of rFactr, Inc.),

        Plaintiffs,

    v.

CHRIS MCDOWELL; CHRIS LAU; and ROBERT DUNN,

        Defendants,

    and

RFACTR, INC.,

        Nominal Defendant.

CHRIS MCDOWELL,

        Third-Party Plaintiff,

    v.

RICHARD BRASSER and GREG GENTNER,

        Third-Party Defendants.

CHRIS LAU and ROBERT DUNN,

        Third-Party Plaintiffs,

    v.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 17741

**ORDER AND OPINION ON DEFENDANT/THIRD-PARTY PLAINTIFF CHRIS MCDOWELL'S AND DEFENDANTS/THIRD-PARTY PLAINTIFFS CHRIS LAU AND ROBERT DUNN'S MOTIONS FOR SUMMARY JUDGMENT**

RICHARD BRASSER and GREG GENTNER,

Third-Party Defendants.

1.      **THIS MATTER** is before the Court upon Defendant/Third-Party Plaintiff Chris McDowell's ("McDowell") Motion for Summary Judgment ("McDowell's Motion"), (ECF No. 109), and Defendants/Third-Party Plaintiffs Chris Lau ("Lau") and Robert Dunn's ("Dunn") (together, with McDowell, "Defendants") Motion for Summary Judgment ("Lau and Dunn's Motion"), (ECF No. 118), (together, the "Motions"), pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)") in the above-captioned case.

2.      Having considered the Motions and the briefs, exhibits, and affidavits in support of and in opposition to the Motions, the arguments of counsel at the hearing on the Motions, and other appropriate matters of record, the Court **GRANTS in part and DENIES in part** the Motions as set forth below.

> *Moore & Van Allen PLLC, by Christopher Donald Tomlinson and William M. Butler, for Plaintiffs Young Kwon and Keith Lee.*
>
> *James, McElroy & Diehl, P.A., by John R. Buric, for Nominal Defendant rFactr, Inc.*
>
> *Troutman Pepper Hamilton Sanders LLP, by William J. Farley, Mackenzie Willow-Johnson, and Kiran H. Mehta, for Defendants and Third-Party Plaintiffs Robert Dunn and Chris Lau.*
>
> *Rosenwood, Rose, & Litwak, PLLC, by Erik M. Rosenwood and Carl J. Burchette, for Defendant and Third-Party Plaintiff Chris McDowell.*
>
> *Lincoln Derr PLLC, by Phoebe Norton Coddington and Sara R. Lincoln, for Third-Party Defendants Richard Brasser and Greg Gentner.*

Bledsoe, Chief Judge.

I.

FACTUAL AND PROCEDURAL BACKGROUND

3. "The Court does not make findings of fact on motions for summary judgment; rather, the Court summarizes material facts it considers to be uncontested." *McGuire v. Lord Corp.*, 2021 NCBC LEXIS 4, at *3 (N.C. Super. Ct. Jan. 19, 2021).

4. This case arises from the demise of Nominal Defendant rFactr, Inc. ("rFactr" or the "Company"), a North Carolina corporation that operated as a business-to-business sales technology and strategy company that helped sales organizations use social media to improve sales. All Plaintiffs and Defendants invested in rFactr and subsequently lost the total value of their investments. Defendants each served on the rFactr Board of Directors (the "Board") sometime between 2015 and the present.

5. Plaintiffs allege that while on the Board, Defendants failed to oversee and monitor rFactr's finances and operations and, in particular, to take action to prevent rFactr's Chief Executive Officer, Third-Party Defendant Richard Brasser ("Brasser"), and Chief Operating Officer, Third-Party Defendant Greg Gentner ("Gentner"), from engaging in corporate mismanagement and malfeasance, which caused Plaintiffs to suffer their investment losses. Separately, Plaintiffs allege that McDowell is liable for inducing them to invest in rFactr without disclosing certain material information about the Company as well as that the Company would compensate him if Plaintiffs chose to invest.

A.    The Creation of rFactr

6.    In 2000, Brasser founded an interactive golf and marketing company called Targeted Golf Solutions, Inc. ("Targeted Golf") and thereafter served as its President and Chief Executive Officer.[1] Gentner joined Brasser at Targeted Golf in 2004 as the company's Vice President and Chief Operating Officer.[2] Targeted Golf incurred certain liabilities early in its existence, including a $400,000 loan from Baker Clark, a venture capital firm,[3] and, in February 2007, a $175,000 line of credit with Main Street Bank.[4]

7.    In 2008, Brasser changed the company's name to The Targeted Group, Inc. ("Targeted Group") and focused the business on interactive social media marketing.[5] Targeted Group's investors included McDowell, a colleague and friend of Brasser's.[6] McDowell met Brasser in the early 2000s through mutual friends, and their families often saw each other socially.[7] According to Brasser, McDowell made a "preferred security and equity investment" in Targeted Group in an amount between $50,000

---

[1] (Dep. Richard Brasser, dated Nov. 2, 2021, at 14:14–19 [hereinafter "Brasser Dep."], ECF No. 114.3; Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. B [hereinafter "rFactr Search Results"], ECF No. 114.2.)

[2] (Brasser Dep. 14:15–23, 18:15–17, ECF No. 114.3.)

[3] (Brasser Dep. 222:19–28:15, ECF No. 114.3.)

[4] (Brasser Dep. 22:15, ECF No. 114.3; Aff. William M. Butler, Dep. Ex. 59, ECF No. 124.23.)

[5] (Brasser Dep. 15:7–12, ECF No. 114.3.)

[6] (Dep. James Christopher McDowell, dated Apr. 23, 2021, at 17:10–18:5, 24:19–25:10 [hereinafter "McDowell Dep."], ECF No. 103.3; McDowell Dep. 33:21–34:3, ECF No. 125.6; Brasser Dep. 29:18–20, ECF No. 125.1.)

[7] (McDowell Dep. 32:16–33:9, ECF No. 103.3.)

and $75,000, acted as the representative of the preferred shareholders of Targeted Group, and was "intimately involved" with the company on a weekly basis.[8]

8.     In 2013, Brasser changed Targeted Group's name to rFactr and began promoting its "social sales solution" to other companies.[9] The newly rebranded rFactr was a continuation of the entity formerly known as Targeted Group and remained subject to the outstanding debts incurred when the Company operated under that name.[10] Targeted Group's equity investors, including McDowell,[11] also retained their investments in the renamed company.[12]

B.     Plaintiffs Invest in rFactr

9.     In approximately January 2014, Brasser and McDowell agreed that McDowell would be paid a fee of 10% of all investments he successfully solicited in rFactr.[13] This agreement eventually took the form of a Consulting Agreement executed by McDowell and rFactr in June or July 2014 under which McDowell agreed to provide financial consulting and business development services to the Company in

---

[8] (Brasser Dep. 29:2–30:1, ECF No. 125.1.)

[9] (Brasser Dep. 16:21, ECF No. 114.3; Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. J [hereinafter "Articles of Restatement of Targeted Group"], ECF No. 114.10; rFactr Search Results.)

[10] On 30 May 2013, Targeted Group filed its Fourth Amended and Restated Articles of Incorporation that included the name change to rFactr. (Articles of Restatement of Targeted Group.)

[11] (Aff. Erik M. Rosewood, Ex. 4 [hereinafter "Brasser Production"], ECF No. 103.4.)

[12] (Brasser Dep. 226:1–27:1, ECF No. 114.3.)

[13] (Brasser Dep. 33:24–39:1, ECF No. 125.1.)

exchange for this compensation.[14] The Consulting Agreement was modified in August 2014 to limit McDowell's services to financial consulting.[15]

10. McDowell's primary employment in 2014 was as an investment broker selling bonds,[16] and his clients included Plaintiffs' employers.[17] Plaintiffs are both sophisticated, experienced investment and finance professionals working in New York City[18] and worked with McDowell on behalf of their respective employers at that time.[19]

11. McDowell first discussed his investment in rFactr with Plaintiffs in early 2014.[20] During this discussion, McDowell told Plaintiffs that he had personally

---

[14] (Aff. Carl J. Burchette, Ex. 2 at 11 [hereinafter "McDowell Consulting Agreement"], ECF No. 127.2.)

[15] (McDowell Consulting Agreement 8.) While McDowell does not dispute the existence of the Consulting Agreement, he asserts that he never signed it. (McDowell Dep. 102:4–8, ECF No. 125.6.)

[16] (Dep. Young Kwon, dated May 10, 2021, at 12:5–8 [hereinafter "Kwon Dep."], ECF No. 125.3; Dep. Keith Lee, dated May 11, 2021, at 12:1–13, 15:9–13 [hereinafter "Lee Dep."], ECF No. 125.5; Lee Dep. 12:1–13, ECF No. 103.1.)

[17] (Kwon Dep. 12:5–13:1, ECF No. 125.3; Lee Dep. 15:9–13, ECF No. 125.5.)

[18] (Kwon Dep. 9:2–22, ECF No. 103.1; Lee Dep. 10:13–12:16, ECF No. 103.2.) Kwon's prior experience included three years as an investment banker at Morgan Stanley, six years leading the commercial real estate group at a Japanese insurance company, three years as a planning manager at JP Morgan, six years at Apollo Global Management as head of "CMDS and ADS trading," and founder of Atalaya Capital Management, a commercial real estate business. (Kwon Dep. 9:2–22; ECF No. 103.1.) Lee's prior experience included running a trading desk and participating in the sales force at UBS and later working for H/2 Capital Partners, a hedge fund. (Lee Dep. 10:13–12:16, ECF No. 103.2.)

[19] As of spring 2014, Kwon worked for Apollo Global Management, Lee worked for H/2 Capital, and McDowell worked for Amherst Securities Group. (Kwon Dep. 12:1–20, ECF No. 125.3; Lee Dep. 14:1–17, 15:9–13, ECF No. 125.5.)

[20] (McDowell Dep. 33:21–34:3, ECF No. 125.6; Brasser Dep. 29:18–20, ECF No. 125.1.)

invested in rFactr and was "actively involved in management oversight" of the Company.[21] As a result of McDowell's representations, Plaintiffs took an interest in the Company. McDowell thereafter provided Plaintiffs with some written materials describing the nature of the Company and offered to arrange a meeting for Plaintiffs with Brasser.[22] McDowell did not mention then or later that rFactr, through Brasser, had promised to pay him a fee for each new investor McDowell induced to invest in the Company.

12. According to Plaintiffs and Brasser, McDowell introduced Plaintiffs to Brasser at a dinner in New York City in early March 2014.[23] At the dinner, Kwon "asked [Brasser] a bunch of questions . . . about his track record, about the business plan, what the management team comprised of, the Board of Directors, and then what the exit might be."[24] Brasser "answered all those questions."[25] Plaintiffs assert,

---

[21] (McDowell Dep. 54:10–15, ECF No. 125.6; Lee Dep. 21:9–11, ECF No. 125.5.)

[22] (McDowell Dep. 72:20–22, ECF No. 125.6; Aff. William M. Butler, Dep. Ex. 22, ECF No. 124.16; Aff. William M. Butler, Dep. Ex. 23, ECF No. 124.17.)

[23] (*See* Lee Dep. 211:13–12:1, ECF No. 125.5; Kwon Dep. 21:12–24:6, ECF No. 125.3; Brasser Dep. 102:5–23, ECF No. 125.1.) While Plaintiffs have asserted that this dinner occurred on 6 March 2014, McDowell has offered evidence that suggests that he was not at a dinner on that date, (Aff. Chris McDowell, Ex. A, ECF No. 102.1; Brasser Production 0002113 ("I am looking forward to meeting you and Young for dinner. It is too bad that McDowell can't join us[.]")). Responding to McDowell's evidence, Plaintiffs have testified that while a dinner meeting with Brasser and McDowell most definitely occurred, the date of the meeting might have been shortly before or after 6 March 2014. (Lee Dep. 29:21–30:1, ECF No. 103.2.) Because the Court must view the evidence in the light most favorable to Plaintiffs, for purposes of the Motions, the Court takes as fact that a meeting between Plaintiffs, Brasser, and McDowell occurred in early March 2014.

[24] (Kwon Dep. 22:2–6, ECF No. 103.1.)

[25] (Kwon Dep. 22:7, ECF No. 103.1.)

however, that Brasser made three statements at this dinner that McDowell knew were false yet did not correct: (i) that rFactr was a new company; (ii) that investments in rFactr would serve as bridge financing specifically to support anticipated new subscription demand; and (iii) that the Company would be cash flow positive in six months.[26]

13. Plaintiffs aver that thereafter McDowell assured them of the good reputations of Brasser and Gentner, as well as rFactr's prospects for the future and its potential profitability.[27] They also testified that McDowell told them that he would act as an intermediary to Brasser regarding rFactr.[28]

14. Despite McDowell's offer to intervene, Plaintiffs engaged in direct communications with Brasser and Gentner about their potential investments between the initial dinner in early March and the closing on Plaintiffs' investments in late March and April.[29] During this roughly one-month period, Plaintiffs communicated with Brasser and Gentner and discussed investment timelines, the amounts of their investments, the purchase agreement, and the Company's financial

---

[26] (Resp. Opp'n Defs.' Mots. Summ. J. 4, 24 [hereinafter "Resp."], ECF No. 125; Lee Dep. 28:19–29:7, ECF No. 125.5; Kwon Dep. 214:1–17, ECF No. 125.3; Verified Am. Compl. ¶23 [hereinafter "Am. Compl."], ECF No. 10.) Plaintiffs also assert that Brasser stated that the investment opportunity was open to friends and family with a "near-term exit opportunity" and that investors would be treated like family and friends. (Resp. 4, 24; Am. Compl. ¶ 22.)

[27] (Lee Dep. 31:16–18, 203:15–17, ECF No. 125.5; Kwon Dep. 28:14–25, ECF No. 125.3.)

[28] (Kwon Dep. 30:2–11, ECF No. 103.1.)

[29] (Lee Dep. 33:4–18, ECF No. 103.2; Kwon Dep. 25:4–25, ECF No. 103.1.)

information.[30] Brasser arranged a webcast so that Plaintiffs could see and understand how rFactr's software worked.[31] Gentner also sent financial statements to Lee via email on 26 March 2014 that allegedly included a "Proforma Spreadsheet for 2014" as well as audited financial statements covering 2011 and 2012.[32] Gentner described the audited financial statements as "from our 2013 Qualified Business Valuation filing for the State of North Carolina" and reported to Lee that "[o]ur post-valuation at the end of our Preferred Seed Round was $13.25 million."[33]

15. The 2011 and 2012 audited financial statements were titled "The Targeted Group, Inc. Statements of Financial Condition" in bold on the top of each page and included detailed information regarding the company's financial status in those years.[34] The statements reflected Targeted Group's total assets and liabilities, stockholders' deficit, net sales, gross profit, other income and expense, cash flows, and balance sheets for 2011 and 2012 and identified the company's total 2012 year-end

---

[30] (Brasser Production 0002141–43, 0002152–54, 0002181–84, 0002189–92; Kwon Dep. 25:11–26:7, ECF No. 103.1.)

[31] (Kwon Dep. 25:16–18, ECF No. 103.1.)

[32] (Aff. Erik M. Rosenwood, Ex. 5 at 00000205, 0000209–20 [hereinafter "Pls.' Production"], ECF No. 103.5; Lee Dep. 213:20–14:19, ECF No. 125.5; Lee Dep. 33:4–18, ECF No. 103.2; Kwon Dep. 26:1–6, ECF No. 103.1.) Although Gentner states in his March 26 email to Lee that the "Proforma Spreadsheet for 2014" is attached and Plaintiffs have not denied receiving it, it does not appear to the Court that the spreadsheet itself has been made a part of the record (it is not at the exhibit cited in McDowell's brief (Exhibit 5 of the Rosenwood Affidavit)). As a result, the Court does not base its conclusions in this Order and Opinion on the contents of the spreadsheet since that evidence is not before the Court.

[33] (Pls.' Production 0000205.)

[34] (Pls.' Production 0000209–20.)

liabilities as $3,247,387, which included long-term debt of $1,400,500.[35] The statements also showed that Targeted Group had a net operating loss of $1,101,571 for 2012.[36]

16. In addition, the statements contained a section describing the history of Targeted Group, including that the company previously operated as Targeted Golf.[37] While not mentioning rFactr by name, the financial statements described Targeted Group's business in terms equally applicable to rFactr:

> The Company provides a software platform to create successful and sustainable social media solutions by empowering organizations to connect and deepen their most important relationships. The company provides social media solutions by delivering dynamic, branding social media solutions that include customized Saas solutions including its proprietary Enterprise Social Media Management Software (SMMS).[38]

17. Shortly after receiving this information from Brasser and Gentner, each Plaintiff purchased convertible promissory notes issued by rFactr.[39] Kwon purchased a single note on 19 March 2014 in the amount of $300,000,[40] and Lee purchased two

---

[35] (Pls.' Production 0000209–20.)

[36] (Pls.' Production 0000212, 0000214.)

[37] (Pls.' Production 0000216.)

[38] (Pls.' Production 0000216.)

[39] (Am. Compl. ¶ 29.)

[40] (Am. Compl. ¶ 31; Brasser Production 0185335.)

notes, the first on 4 April 2014 in the amount of $250,000[41] and the second on 19 March 2015 in the amount of $50,000.[42]

18.     Each Plaintiff signed a written purchase agreement to effect these investments, representing in each agreement as follows:

> Purchasers have reviewed the representations concerning the Company contained in this Agreement, and such other information regarding the Company and its business, operations, market potential, capitalization, financial condition and prospects, and all other matters deemed relevant by Purchasers.  The Company has also made available to the Purchasers the opportunity to ask questions of, and receive answers from, the Company concerning the terms and conditions of these Notes and to obtain any additional information, to the extent that the Company possesses such information, and can acquire it without unreasonable effort or expense.[43]

19.     After Plaintiffs purchased their notes, McDowell made a second equity investment in rFactr on 24 July 2014 in the amount of $25,000.[44]

C.     McDowell and Dunn Join the Board

20.     McDowell joined rFactr's Board in March 2015 at roughly the same time Lee made his second investment in the Company.[45]  Soon thereafter, on 9 June 2015,

---

[41] (Am. Compl. ¶ 30; Brasser Production 0185335.)

[42] (Am. Compl. ¶ 30; Brasser Production 0185335.)  At the time of Plaintiffs' investments in rFactr, Kwon estimated that the failure rate for angel investments like rFactr was "90 percent" because they are "highly speculative."  (Kwon Dep. 31:18–25; *see also* Lee Dep. 33:23–34:2 ("I think the failure rates are pretty high.").)

[43] (Pls.' Production 0000200, at Convertible Note Purchase Agreement 3.5; Am. Compl. ¶ 32.)

[44] (Brasser Production 0185335.)

[45] (McDowell Dep. 112:7–20, 114:12–22, ECF No. 125.6.)

McDowell made a third equity investment in rFactr, again in the amount of $25,000.[46] McDowell remained on rFactr's Board until the end of 2017.[47]

21. Dunn joined the Board in April 2015 and served as a board member until July 2017.[48] Neither McDowell nor Dunn were employed by rFactr, but each received rFactr stock options as compensation for their service on the Board.[49] Brasser and Gentner were rFactr's only other board members until June 2017.[50]

22. According to McDowell and Dunn, Brasser and Gentner engaged in a pattern of mismanagement and malfeasance throughout McDowell's and Dunn's board service that significantly impeded McDowell's and Dunn's ability to monitor the Company's operations and performance. This conduct included Brasser's and Gentner's repeated (i) practice of providing McDowell and Dunn inconsistent and incomplete information about the Company;[51] (ii) refusal to provide McDowell and Dunn important financial information about the Company, including information about Brasser's and Gentner's compensation;[52] and (iii) refusal to consider or

---

[46] (Brasser Production 0185335.)

[47] (McDowell Dep. 112:7–20, 114:12–22, ECF No. 125.6.)

[48] (Dep. Robert Dunn, dated Apr. 21, 2021, at 26:20–23 [hereinafter "Dunn Dep."], ECF No. 125.2.)

[49] (*See* Dunn Dep. 20:23–21:3, 99:25–100:3, ECF 114.6; McDowell Dep. 97:16–98:8, ECF No. 103.3.)

[50] (Aff. William M. Butler, Dep. Ex. 25, ECF No. 124.18.)

[51] (McDowell Dep. 117:16–19, ECF No. 103.3; Aff. William M. Butler, Dep. Ex. 13 at 000005159, ECF No. 124.10.)

[52] (Dunn Dep. 42:3–10, 62:16–18, ECF 114.6; McDowell Dep. 179:6–80:7, ECF No. 103.3; Brasser Production 0193747.)

implement any changes suggested by McDowell and Dunn, including, in particular, to address concerns about the Company's lack of recordkeeping and reporting controls.[53]

23. Despite Brasser's and Gentner's persistent lack of cooperation, McDowell and Dunn did succeed in obtaining certain information from them, including (i) at a board meeting in September or October 2015, a cash flow statement for the period 1 January 2015 through 30 September 2015;[54] and (ii) in the summer of 2015, compensation information for all rFactr employees, including for Brasser ($330,000 base compensation) and Gentner ($230,000 base compensation).[55]

24. Collectively, these documents showed that Brasser's and Gentner's compensation consumed a substantial percentage of the Company's total revenues.[56] Early on, McDowell and Dunn considered Brasser's and Gentner's compensation to be excessive, particularly in light of rFactr's small size and declining prospects, and therefore took measures to try to reduce their pay.[57] These efforts included Dunn's

---

[53] (Aff. William M. Butler, Dep. Ex. 3 [hereinafter "26 May 2017 Email"], ECF No. 124.3.)

[54] (Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. M at 000003563–68 [hereinafter "2015 Financial Documents and Compensation"], ECF No. 114.13.)

[55] (2015 Financial Documents and Compensation 000003559; McDowell Dep. 117:10–15, ECF No. 125.6.) These documents can also be found at Aff. William M. Butler, Dep. Ex. 7, ECF No. 124.6.

[56] (*See* 2015 Financial Documents and Compensation 000003555–68.)

[57] (Dunn Dep. 69:2–71:23, ECF No. 114.6; McDowell Dep. 118:4–21:1, ECF No. 103.3; McDowell Dep. 135:21–36:6, ECF No. 125.6; 2015 Financial Documents and Compensation 000003502; Aff. William M. Butler, Dep Ex. 6, ECF No. 124.5; Aff. William M. Butler, Dep. Ex. 14 [hereinafter "29 March 2017 Emails"], ECF No. 124.11.)

consultation with an executive compensation expert,[58] who advised that reasonable compensation for similarly situated executives should be no more than $75,000 to $100,000,[59] and McDowell's and Dunn's repeated insistence to Brasser and Gentner that they agree to a reduction in their compensation.

25. McDowell's and Dunn's efforts appeared to have borne fruit when Brasser and Gentner agreed to reduce their compensation if rFactr was not at least cash flow neutral by the end of the third quarter of 2015.[60] When rFactr failed to meet this milestone, however, Brasser and Gentner refused to make the agreed-upon compensation reduction,[61] and Brasser grew angry and refused to speak to McDowell and Dunn when they complained to him about reneging on his agreement.[62] Brasser and Gentner thereafter continued to pay themselves compensation that McDowell and Dunn considered excessive.

26. Some months later, in October 2015, Brasser proposed a reduction in his base compensation to $230,000, provided that he receive a 10% commission for any sales he made and a revenue share of 7.5% if rFactr had gross revenues over

[58] (Resp. 18; Chris Lau and Robert Dunn's Mem. Supp. Mot. Summ. J. 18 [hereinafter "Lau and Dunn Br."], ECF No. 117; Def./Third-Party Pl. Chris McDowell's Br. Supp. Mot. Summ. J. 26–27 [hereinafter "McDowell Br."], ECF No. 107; *see* 2015 Financial Documents and Compensation 000003503–07.)

[59] (Resp. 18; Lau and Dunn Br. 18; McDowell Br. 26–27; *see* 2015 Financial Documents and Compensation 000003504.)

[60] (McDowell Dep. 118:4–19:3, ECF No. 103.3.)

[61] (McDowell Dep. 119:10–20, ECF No. 103.3.)

[62] (McDowell Dep. 119:10–19:20, ECF No. 103.3.)

$300,000.[63] McDowell and Dunn comprised a majority of the disinterested board members eligible to vote on Brasser's and Gentner's compensation[64] and rejected Brasser's proposal, deeming it not in the Company's best interest.[65] Thereafter, Brasser and Gentner continued to pay themselves compensation that McDowell and Dunn considered excessive, until 2016, when Brasser and Gentner elected not to cash a few of their compensation checks due to the Company's declining cash reserves.[66]

27. In January 2017, rFactr published to its investors an Investor Update reporting $1.2 million in 2016 revenues.[67] On 17 February 2017, Dunn emailed McDowell, pointing out that the Investor Update described an inappropriately optimistic forecast as a "run-rate," an error that Dunn attributed to Brasser's and Gentner's "lack [of] business acumen" or their attempt to misrepresent the financials of rFactr.[68] Dunn challenged Brasser and Gentner on the error, but neither Dunn, McDowell, nor the Board notified the Company's investors about the mistake.[69]

---

[63] (Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. O, ECF No. 114.15.)

[64] (*See* Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. L at 6 [hereinafter "rFactr Bylaws"], ECF No. 114.12.)

[65] (Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. P, ECF No. 114.16.)

[66] (Brasser Dep. 88:23–89:14, ECF No. 114.3.)

[67] (Dunn Dep. 124:1–25:11, ECF No. 125.2; Aff. William M. Butler, Dep. Ex. 15 [hereinafter "2017 Investor Update and Emails"], ECF No. 124.12; Aff. William M. Butler, Dep. Ex. 17 [hereinafter "Dunn Resignation Emails"], ECF No. 124.13.)

[68] (Dunn Dep. 115:3–20, ECF No. 125.2; 2017 Investor Update and Emails.)

[69] (Dunn Dep. 115:21–16:8, ECF No. 125.2.)

28.     On 2 May 2017, Plaintiffs, through counsel, sent a letter to Brasser requesting financial statements and other documents from rFactr.[70] Gentner provided the requested information the following month.[71] Dunn quickly noticed discrepancies between the June 2017 financials and the numbers reported in the Investor Update. Most significantly, while rFactr had reported $1.2 million in 2016 revenues in the Investor Update, the June 2017 financials stated that rFactr's 2016 revenues were only $546,000—less than half of those reported to investors just five months before.[72]

29.     Matters soon got worse. At a board meeting on 12 June 2017, Brasser and Gentner revealed to McDowell and Dunn for the first time that rFactr had systematically failed to pay payroll taxes to the IRS from September 2014 through June 2016 and that rFactr owed the IRS over $900,000 in unpaid taxes, interest, and penalties as a result, a huge liability for a company of rFactr's size and revenues.[73] McDowell and Dunn promptly advised the Company's other investors about rFactr's tax liability.[74]

---

[70] (Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. S, ECF No. 114.19.)

[71] (Aff. William M. Butler, Dep. Ex. 41, ECF No. 124.21.)

[72] (Dunn Dep. 115:6–16:24; 2017 Investor Update and Emails; Dunn Resignation Emails.)

[73] (Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. X at 0000422 [hereinafter "2017 Board Minutes"], ECF No. 114.24; Aff. William M. Butler, Dep. Ex. 32 at 0000422 [hereinafter "2017 Board Minutes"], ECF No. 124.19; Brasser Dep. 121:14–18, ECF No. 114.3; Dunn Resignation Emails; Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. V, ECF No. 114.22.)

[74] (Kwon Dep. 80:20–25, ECF No. 114.4.)

30.     Three days later, on 15 June 2017, the Board responded to these revelations by voting to add a fifth board seat and inviting Lau to serve on the Board.[75] Lau was an obvious choice because he had invested nearly $2 million in rFactr and had occasionally participated in board calls since 2015.[76] In light of rFactr's tax liability, Dunn, McDowell, and Lau were doubtful that rFactr could survive and placed the blame for the Company's demise squarely on Brasser and Gentner.[77] Brasser soon left his position as Chief Executive Officer to focus on driving the Company's sales and revenue growth but remained on the Board.[78]

31.     The five-person board structure did not last long. Dunn left the Board on 29 June 2017, citing the discrepancy in rFactr's 2016 revenues, the Company's large, undisclosed tax liability, and the misstated run-rate in the Investor Update as reasons for his resignation.[79] His board seat was not filled.

32.     At this point, rFactr had limited cash reserves and was unable to pay its employees or vendors. The Company was also unsuccessful in courting new investors.[80] In an effort to chart a path forward, the Board considered various other

---

[75] (2017 Board Minutes 0000423.)

[76] (2017 Board Minutes 0000423, 0000424; Dep. Luen H. Lau, dated May 6, 2021, at 43:15–45:3 [hereinafter "Lau Dep."], ECF No. 114.8.)

[77] (Aff. William M. Butler, Dep. Ex. 18, ECF No. 124.14.)

[78] (2017 Board Minutes 0000423, 0000424; Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. Y, ECF No. 114.25.)

[79] (Dunn Resignation Emails.)

[80] (Brasser Dep. 237:8–11, 240:8–10, 242:7–43:3, ECF No. 114.3; Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. W, ECF No. 114.23; Brasser Dep. 90:21–91:23, ECF No. 125.1.)

options, including a potential sale to McDowell and Lau that was never consummated,[81] and a sale of assets to a digital customer engagement platform called Grapevine6.[82]

33. The proposed Grapevine6 transaction required rFactr to pay Grapevine6 a cash deposit of $200,000, which would be forfeited if a deal was not timely completed.[83] McDowell and Lau ultimately caused rFactr to reject the sale to Grapevine6, at least in part because they believed that the tax write-offs resulting from rFactr's failure would be more valuable for the Company's investors than the contemplated sale to Grapevine6.[84] After Brasser and Gentner pointed out that not all investors would be able to benefit from such write-offs, Lau acknowledged that rejecting the sale on that basis was a mistake.[85] Though the proposed sale to Grapevine6 was rejected, Brasser successfully negotiated a revenue-share deal with Grapevine6 through which Grapevine6 hired rFactr's employees (other than Brasser and Gentner) and took over rFactr's revenue source.[86] rFactr is no longer an operating entity.

---

[81] (Lau Dep. 189:25–92:2, ECF No. 125.4; Brasser Dep. 270:16–71:24, ECF No. 125.1.)

[82] (Lau 189:10–20, ECF No. 125.4; 2017 Board Minutes 0000432; Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. BB [hereinafter "Grapevine6 Letter of Intent"], ECF No. 114.28; Brasser Dep. 91:2–7, ECF No. 125.1.)

[83] (Grapevine6 Letter of Intent 4.)

[84] (2017 Board Minutes 0000434.)

[85] (2017 Board Minutes 0000435; Brasser Dep. 95:7–96:14, ECF No. 125.1.)

[86] (Brasser Dep. 198:14–200:2, 236:3–8, ECF No. 114.3.)

D.    Procedural History

34.    Lee and Kwon filed this action on 6 September 2019,[87] asserting derivative claims against McDowell, Dunn, and Lau for breach of fiduciary duty, as well as individual claims against McDowell for breach of fiduciary duty; constructive fraud; and securities fraud pursuant to N.C.G.S. § 78A-56(a) ("NCSA"), section 10(b) of the Exchange Act, and Rule 10b-5.[88]

35.    Defendants filed the Motions on 17 December 2022, and after full briefing, the Court held a hearing on the Motions on 16 February 2022 (the "Hearing"), at which all parties were represented by counsel.   The Motions are now ripe for resolution.

II.

LEGAL STANDARD

36.    "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' " *Da Silva v. WakeMed*, 375 N.C. 1, 10 (2020) (quoting N.C. R. Civ. P. 56(c)).  "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *Lowe v. Bradford*, 305 N.C. 366, 369 (1982).

---

[87] (Compl., ECF No. 3.)

[88] (Am. Compl. ¶¶ 90–120.)

37. "The summary judgment standard requires the trial court to construe evidence in the light most favorable to the nonmoving party." *Draughon v. Evening Star Holiness Church of Dunn*, 374 N.C. 479, 482 (2020). Accordingly, the Court will "draw all reasonable inferences in favor of plaintiffs." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 662 (1997).

38. "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985). "The showing required for summary judgment may be accomplished by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (internal citations omitted). "If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmovant to present specific facts which establish the presence of a genuine factual dispute for trial." *In re Will of Jones*, 362 N.C. 569, 573 (2008). "Nevertheless, if there is any question as to the weight of evidence summary judgment should be denied." *Id.* (cleaned up).

III.

ANALYSIS

A. Derivative Claims for Breach of Fiduciary Duty

39. Plaintiffs have asserted derivative claims against McDowell, Dunn, and Lau for breach of the fiduciary duties they owe as directors of rFactr, alleging that (i)

McDowell and Dunn failed to adequately monitor and oversee rFactr; (ii) McDowell and Dunn failed to prevent the payment of excessive compensation to Brasser and Gentner; [89] and (iii) McDowell and Lau engaged in improper self-dealing by rejecting the sale of rFactr to Grapevine6 in November 2017.[90]

40. Defendants seek dismissal of each of Plaintiffs' claims, contending that the undisputed evidence establishes that (i) McDowell and Dunn met their duty of care by taking reasonable measures in good faith to stay informed about rFactr's business; (ii) McDowell's and Dunn's decisions concerning Brasser's and Gentner's compensation were made in good faith and are protected by the business judgment rule; and (iii) McDowell's and Lau's rejection of the Grapevine6 transaction was not improper self-dealing, and regardless, the rejection did not harm rFactr because rFactr lacked sufficient funds to meet Grapevine6's non-negotiable deal terms.[91]

---

[89] While Plaintiffs appear to argue that Lau may be liable for failing to obtain financial records and to reduce Brasser's and Gentner's compensation, by the time Lau joined the Board in June 2017, it is undisputed that McDowell, Dunn, and Lau had obtained up-to-date financial information from rFactr, (2017 Board Minutes 00000422), and Brasser and Gentner were no longer accepting compensation due to rFactr's financial troubles, (2017 Board Minutes 00000426). As a result, the Court concludes that to the extent Plaintiffs' derivative claims arising from Defendants' alleged failure to monitor and oversee the Company's operations or prevent the payment of excessive compensation are asserted against Lau, those claims should be, and therefore are, hereby dismissed for failure to offer evidence sufficient to sustain their claim under Rule 56.

[90] (Resp. 13–22.)

[91] (McDowell Br. 27–29; Lau and Dunn Br. 16–21.)

*1. Claims Based on Duty to Monitor and Duty of Oversight*

41.     The Court first considers Plaintiffs' derivative claims against McDowell and Dunn for breach of fiduciary duty based on their alleged failure to monitor and oversee rFactr and its operations.

42.     A director of a North Carolina corporation is required to perform his or her duties "(1) [i]n good faith; (2) [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) [i]n a manner he [or she] reasonably believes to be in the best interests of the corporation."  N.C.G.S. § 55-8-30(a).  To assess whether a director has met this standard, a reviewing court must examine "the care (1) an ordinarily prudent person, (2) in a like position, (3) would exercise under similar circumstances, and (4) whether the officer or director acted in a manner he reasonably believed to be in the best interests of the corporation." *State v. Custard*, 2010 NCBC LEXIS 9, at *55 (N.C. Super. Ct. Mar. 19, 2010).  Importantly, "[this] standard of conduct is subject to review under the business judgment rule." *Id*.

43.     The North Carolina courts offer limited guidance concerning a director's duty to monitor and oversee the corporation's business affairs.  Former Business Court Judge Ben Tennille's 2010 decision in *Custard* is the most thoroughgoing and is helpful here.  *Id*. at *65–70.  In that case, Judge Tennille relied heavily upon Delaware law.  *Id*. at *48 (noting that "North Carolina courts have frequently looked to the well-developed case law of corporate governance in Delaware for guidance").  This Court, too, concludes that Delaware law provides important and useful guidance

in assessing a director's duty to monitor and duty of oversight under North Carolina law and will consult relevant decisions from the Delaware courts in considering the Motions. *See, e.g., Reynolds Am. Inc. v. Third Motion Equities Master Fund Ltd.*, 379 N.C. 524, 528 (2021) (electing to "borrow freely" from Delaware decisions in judicial appraisal action); *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 613 (2018) (relying on Delaware decisions to decide voting power issues in shareholder suit).

44. The starting point under Delaware law—as it was for Judge Tennille in *Custard*—is the Delaware Chancery Court's decision in *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). In *Caremark*, the Chancery Court held as follows:

> Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.

*Caremark*, 698 A.2d at 971.

45. The Delaware Supreme Court subsequently embraced the Chancery Court's *Caremark* holding in *Stone v. Ritter*, 911 A.2d 362, 365 (Del. 2006), stating that:

> *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

46. Most recently, the Delaware Supreme Court has described a director's *Caremark* duties as follows:

> As with any other disinterested business judgment, directors have great discretion to design context—and industry—specific approaches tailored to their companies' businesses and resources. But *Caremark* does have a bottom-line requirement that is important: the board must make a good faith effort—i.e., try—to put in place a reasonable board-level system of monitoring and reporting. Thus, our case law gives deference to boards and has dismissed *Caremark* cases even when illegal or harmful company activities escaped detection, when the plaintiffs have been unable to plead that the board failed to make the required good faith effort to put a reasonable compliance and reporting system in place.

*Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019) (footnote omitted).

47. Given the minimal burden the *Caremark* standard imposes on directors to satisfy their duty of loyalty to the corporation, both the Delaware Chancery Court and the Delaware Supreme Court have noted that "a *Caremark* claim is 'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) (quoting with approval *Caremark*, 698 A.2d at 967). McDowell and Dunn contend that they satisfied this minimal burden here, and the Court agrees.

48. First, it is undisputed that McDowell and Dunn made numerous requests for information during the time they were on the Board[92] and that they were able to obtain a Company cash flow statement and information regarding Brasser's and

---

[92] (Brasser Production 0193747; Dunn Dep. 41:10–19, ECF No. 114.6; Brasser Dep. 50:15–25, ECF No. 114.3; Aff. William M. Butler, Dep. Ex. 2, ECF No. 124.2.)

Gentner's compensation. [93] Rather than evidence an indifference to or a conscious disregard of their duties as board members as Plaintiffs suggest, McDowell's and Dunn's repeated requests reflect a good faith attempt to monitor and oversee the Company.

49. In addition, while it is undisputed that there was no board-level system of monitoring and reporting at rFactr, the Court is mindful that a director's *Caremark* duties must be "judged in the context in which they occur." *Custard*, 2010 NCBC LEXIS 9, at *51. Here, rFactr was a small, heavily indebted startup company, and McDowell and Dunn served on a four-member board with the Company's founders and chief executive officers, Brasser and Gentner. The evidence is undisputed that McDowell and Dunn made repeated informal requests to Brasser and Gentner to implement a system of recordkeeping and reporting for directors and shareholders, but Brasser and Gentner consistently refused.[94] Because the Company's bylaws required majority consent for board action,[95] McDowell and Dunn could not impose such a reporting system over the other board members' objections. Even though McDowell and Dunn were ultimately unsuccessful due to Brasser's and Gentner's opposition, the Court cannot conclude in these circumstances that McDowell and Dunn failed to "try [ ] to put in place a reasonable board-level system of monitoring

---

[93] (Dunn Dep. 41:10–19, ECF No. 114.6; Brasser Dep. 50:15–25, ECF No. 114.3; 2015 Financial Documents and Compensation 000003555–68.)

[94] (*See, e.g.*, 26 May 2017 Email.)

[95] (rFactr Bylaws 6.)

and reporting," *Marchand*, 212 A.3d at 821, or "utter[ly] fail[ed] to attempt to assure a reasonable information and reporting system exists," *Caremark*, 698 A.2d at 971.

50. Plaintiffs nonetheless argue that McDowell and Dunn should have done more—and indeed they certainly could have made a formal request for board action, proposed and voted for a board resolution, taken legal action, resigned in protest, or taken other measures to advocate for a reporting system. But *Caremark* does not require that directors do very much to meet their duty of loyalty in this context—they simply must do something. And here, in the context of this board and this company, to require McDowell and Dunn to initiate futile formal action to satisfy their duties under *Caremark* would place form over substance and would be inconsistent with both North Carolina and Delaware precedent. *See, e.g.*, *Custard*, 2010 NCBC LEXIS 9, at *50–51 (noting that "every analysis of fiduciary conduct is contextual in nature, and the contexts in which fiduciary duties are applied are constantly changing"); *see also, e.g.*, *In re Citigroup Inc. S'holder Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009) ("[T]o establish oversight liability a plaintiff must show that the directors knew they were not discharging their fiduciary obligations or that the directors demonstrated a conscious disregard for their responsibilities such as by failing to act in the face of a known duty to act." (emphasis omitted)).

51. In sum, the undisputed facts show that McDowell and Dunn were not disengaged, acquiescent, or blindly compliant directors. Rather, they were regularly requesting financial information but were stymied by the two other members of the Board who had an equal vote under the bylaws. While McDowell and Dunn certainly

could have taken other and perhaps more productive action, in this context, *Caremark* does not require that they do more. *Cf., e.g., ATR–Kim Eng Fin. Corp. v. Araneta*, No. 489–N, 2006 Del. Ch. LEXIS 215, at \*75 (Del. Ch. Dec. 21, 2006) (finding that independent board members breached their fiduciary duties after "they entirely deferred to [a majority shareholder board member] in matters relating to the [company]"). Thus, the Court concludes that Plaintiffs' derivative claims based on McDowell's and Dunn's alleged breach of their fiduciary duty to monitor and oversee the Company should be dismissed.

### 2. Claims Based on Payment of Excessive Compensation

52. The Court next considers Plaintiffs' claims for breach of fiduciary duty based on Defendants' alleged failure to prevent the payment of excessive compensation to Brasser and Gentner. Plaintiffs contend that McDowell and Dunn consistently recognized that Brasser's and Gentner's compensation was plainly excessive[96] yet elected not to reduce either officer's compensation despite their ability to do so as the majority of the disinterested directors eligible to vote on the compensation paid to these executives.[97]

---

[96] Indeed, Dunn stated in October 2015 that "[t]here is no question in my mind that the comp[ensation] is excessive for this company given its weak positions and performance," (2015 Financial Documents and Compensation 000003502), and that "the salaries are outrageous relative to revenue and cashflow especially as they endanger the very survival of the company," (Aff. William M. Butler, Dep Ex. 6, ECF No. 124.5). He later stated that Brasser's and Gentner's compensation "cannot in good faith, business acumen, and in accordance with our fiduciary responsibilities continue indefinitely." (29 March 2017 Emails.) McDowell testified similarly, stating that he and Dunn were "horrified" at the level of compensation paid to Brasser and Gentner, (McDowell Dep. 135:21–36:6, ECF No. 125.6), and admitting that Brasser's management did not reflect "a rational approach to things," (McDowell Dep. 153:13–54:6, ECF No. 125.6).

[97] (Resp. 18–19.)

53. McDowell and Dunn move to dismiss, arguing that their decisions concerning Brasser's and Gentner's compensation involved the careful exercise of business judgment—one in which they balanced the compensation that the struggling company could afford to pay against the need to pay compensation sufficient to retain Brasser and Gentner, executives whose knowledge, experience, and abilities were critical to the Company's survival.[98] McDowell and Dunn contend that, on these undisputed facts, their actions should be protected by the business judgment rule as a matter of law.

54. A director's standard of care is described in N.C.G.S. § 55-8-30 as follows:

> [a] director shall discharge the director's duties as a director, including the director's duties as a member of a committee or subcommittee, in accordance with all of the following: (1) In good faith. (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances. (3) In a manner the director reasonably believes to be in the best interests of the corporation.

55. The business judgment rule has been described as "an extension of the fundamental principle that the management of the business and affairs of a corporation is entrusted to its directors as the duly elected and authorized representatives of the shareholders." Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 14.06 (rev. 7th ed. 2006). The rule creates

> an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and

---

[98] (Lau and Dunn Br. 18–19; Chris Lau and Robert Dunn's Reply to Pls.' Mem. Opp'n Mot. Summ. J. 6–8 [hereinafter "Lau and Dunn Reply"], ECF No. 131; McDowell Br. 28–29.)

informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.

*Custard*, 2010 NCBC LEXIS 9, at \*56–57 (quoting *id.*). As a result, "[t]he rule precludes a court from unreasonably reviewing or interfering with managerial decisions by [the board], thus allowing directors to be risk takers without being made subject to judicial second guessing." *Robinson on North Carolina Corporation Law* § 14.06.

56. As previously explained by Judge Tennille:

Absent proof of bad faith, conflict of interest, or disloyalty, the business decisions of officers and directors will not be second-guessed if they are "the product of a rational process," and the officers and directors "availed themselves of all material and reasonably available information" and honestly believed they were acting in the best interest of the corporation. [*Citigroup*, 964 A.2d at 124] (citation and footnote omitted). [The business judgment rule] "is predicated on concepts of gross negligence." *Id.*

*Custard*, 2010 NCBC LEXIS 9, at \*58.

57. Under North Carolina law, directors "are not, as a rule, responsible for mere errors of judgment, nor for slight omissions from which the loss complained of could not have reasonably resulted." *N.C. Corp. Com. v. Harnett Cnty. Tr. Co.*, 192 N.C. 246, 248 (1926). Nevertheless, "[e]vidence that a [director] was inattentive, uninformed, acted in bad faith, or made a decision that is unreasonable may be considered in determining that the business judgment rule does not apply to protect alleged misdeeds." *Emrich Enters. v. Hornwood, Inc.*, 2022 NCBC LEXIS 19, at \*45–46 (N.C. Super. Ct. Feb. 15, 2022) (applying the business judgment rule to the actions of managers). A reviewing court's focus must be on the process undertaken by the

board, not the content of the decision made. *Custard*, 2010 NCBC LEXIS 9, at *57 (citing *Caremark*, 698 A.2d at 967–68).

58. Board decisions that approve compensation amounting to corporate waste are not protected by the business judgment rule. *See Ehmann v. Medflow, Inc.* (*Ehmann I*), 2017 NCBC LEXIS 88, at *58 (N.C. Super. Ct. Sept. 26, 2017) (citing *Grimes v. Donald*, 673 A.2d 1207, 1215 (Del. 1996), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)). "[W]aste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Ehmann v. Medflow, Inc.* (*Ehmann II*), 2020 NCBC LEXIS 46, at *62 (N.C. Super. Ct. Apr. 9, 2020) (quoting *Krieger v. Johnson*, 2014 NCBC LEXIS 13, at *22 (N.C. Super. Ct. Apr. 30, 2014)). Even where a contract reflects "some consideration," there may still be a finding of waste "if the value of the compensation to be paid is so out of all proportion to the value of the services which the beneficiary would be expected to render that no reasonable person would consider that the corporation would receive a quid pro quo." *Ehmann II*, 2020 NCBC LEXIS 46, at *63 (cleaned up). "A claim of waste will arise only in the rare, 'unconscionable case where directors irrationally squander or give away corporate assets.' " *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 74 (Del. 2006); *see Ehmann II*, 2020 NCBC LEXIS 46, at *63.

59. Here, McDowell and Dunn have acknowledged that they were "horrified" by the "outrageous" and "excessive" compensation paid to Brasser and Gentner, and the evidence is undisputed that the expert consulted by Dunn advised that Brasser's

compensation, in particular, was 3 to 4.5 times higher than was typically paid to executives of similarly situated companies.[99] At the same time, McDowell has acknowledged that he considered Brasser "untrustworthy,"[100] that Brasser provided information to the Board that he found "absolutely not useful" and "was basically just lies,"[101] and that Brasser had engaged in conduct with Gentner that caused McDowell to question "for years" whether Brasser and Gentner were acting with willful malfeasance.[102] Ultimately, McDowell declared in June 2017 that "[Brasser] [was] destroying this company for his own gain and [Gentner] is a willing accomplice."[103]

60.    In the face of this evidence, and despite their decision not to take formal action to reduce either executive's pay even though they comprised a majority of the disinterested directors entitled to vote on each executive's compensation, McDowell and Dunn argue that they are entitled to judgment as a matter of law because they exercised reasonable business judgment in rejecting Brasser's proposal to reduce his salary and in addressing Brasser's and Gentner's compensation through informal means.[104] McDowell and Dunn contend that Brasser and Gentner knew the most about rFactr's products, operations, and sales and that had they acted on their

---

[99] (Resp. 18; Lau and Dunn Br. 18; McDowell Br. 26–27; *see* 2015 Financial Documents and Compensation 000003504.)

[100] (McDowell Dep. 121:2–12, ECF No. 125.6.)

[101] (McDowell Dep. 177:11–78:3, ECF No. 125.6.)

[102] (McDowell Dep. 190:12–21, ECF No. 125.6.)

[103] (Aff. William M. Butler, Dep. Ex. 18, ECF No. 124.14.)

[104] (*See* Lau and Dunn Br. 18–19; Lau and Dunn Reply 6–8; McDowell Br. 28–29.)

threats to leave the Company should they find their compensation unsatisfactory, the Company was likely to fail, causing all investors to lose the full value of their investments.[105] McDowell and Dunn assert that after learning of Brasser's and Gentner's excessive compensation in late 2015 and failing in their first confrontation with the pair regarding compensation,[106] they decided to reject Brasser's proposed compensation reduction and not to impose a compensation reduction through other formal, confrontational action. Instead, they argue that they prudently sought to convince Brasser and Gentner to accept less pay through informal persuasion, hoping to convince them to reduce their drain on the Company's cash while at the same time motivating each to stay at the Company.[107]

61. The issue thus posed is whether McDowell's and Dunn's rejection of Brasser's proposed compensation reduction and asserted strategy of informal action to reduce excessive compensation is protected by the business judgment rule as a matter of law when the undisputed evidence shows that McDowell and Dunn (i) knew Brasser's and Gentner's compensation was clearly excessive, (ii) harbored strong suspicions that the pair was engaging in willful malfeasance to the Company's great detriment, and (iii) had the authority to impose a compensation reduction through formal board action but elected not to do so.

---

[105] (Lau and Dunn Br. 18–19; Lau and Dunn Reply 7; Dunn Dep. 86:15–87:3, 88:1–5, ECF No. 114.6.)

[106] (2015 Financial Documents and Compensation 000003502, 000003559; McDowell Dep. 117:19–22, ECF No. 125.6.)

[107] (McDowell Dep. 120:8–21:1, ECF No. 125.6; Dunn Dep. 87:8–19, 88:1–5, 99:4–100:7, ECF No. 114.6; Aff. William M. Butler, Dep. Ex. 13, ECF No. 124.10.)

62. After careful review, the Court concludes that this record creates an issue of fact as to whether McDowell and Dunn engaged in a rational process to address Brasser's and Gentner's excessive compensation, *see Custard*, 2010 NCBC LEXIS 9, at *58 (requiring a director's decision to be the "product of a rational process" for business judgment rule protection), or whether, by their lack of formal action, they unreasonably permitted the waste of rFactr's corporate assets, *see Ehmann II*, 2020 NCBC LEXIS 46, at *63. As such, the Court concludes that McDowell's and Dunn's Motions should be denied on these claims alleging a breach of fiduciary duty in connection with Brasser's and Gentner's compensation.

### 3. Duty of Loyalty and the Grapevine6 Deal

63. Plaintiffs also contend that McDowell and Lau breached their fiduciary duties as directors by causing rFactr to reject a potential sale of rFactr to Grapevine6 to further their own financial gain at the Company's expense. For support, Plaintiffs point to minutes from rFactr's 16 December 2017 board meeting reflecting that although McDowell and Lau "made the decision to cancel the deal with Grapevine because investors have more value with a tax write-off of 25% than in any deal going forward," Lau admitted that "this was a mistake" after Brasser and Gentner advised that "not all investors have write-offs for capital gains, so this decision unfairly causes real damages to a number of investors."[108] Plaintiffs also point to Lau's

---

[108] (Resp. 21; 2017 Board Minutes 0000434–35.)

acknowledgement that he and McDowell were contemplating a purchase of rFactr at the same time rFactr was negotiating a possible sale to Grapevine6.[109]

64. McDowell and Lau argue that their actions are protected by the business judgment rule and, in any event, offer undisputed evidence that Grapevine6 required a $200,000 deposit to proceed to contract, which rFactr could not afford to pay.[110] As a result, McDowell and Lau contend that even if they breached their fiduciary duty to the Company, rFactr was not injured because no transaction with Grapevine6 was ever possible.[111]

65. Under North Carolina law, the duty of loyalty requires that "a fiduciary must strive to advance the best interests of the corporation." *Seraph Garrison, LLC v. Garrison*, No. COA14-1166, 2016 N.C. App. LEXIS 1376, at *8 (N.C. App. Apr. 19, 2016) (citing *In re The Walt Disney Co. Derivative Litig.*, No. 15452, 2004 Del. Ch. LEXIS 132, at *5 n.49 (Del. Ch. Sept. 10, 2004)). "This requirement prohibits the director from using the director's position for personal gain to the detriment of the corporation or its shareholders." *Robinson on North Carolina Corporation Law* § 14.04; *see Maurer v. SlickEdit, Inc.*, 2006 NCBC 1, at *56–57 (N.C. Super. Ct. Feb. 3, 2006) ("[W]here . . . a director proposes corporate action for which she has a personal interest or agenda, there exists a duty of loyalty and a duty of candor to the corporation and the other directors to disclose the personal interest."). "Under a duty

---

[109] (Resp. 22; Lau Dep. 189:25–92:2, ECF No. 125.4.)

[110] (Lau and Dunn Br. 20; Lau and Dunn Reply 2–3; *see* McDowell Br. 28.)

[111] (Lau and Dunn Br. 20; Lau and Dunn Reply 3; *see* McDowell Br. 28.)

of loyalty, a director is not only required to avoid conflicts of interest but also to (1) act in the best interests of those to whom a fiduciary duty is owed and (2) try in good faith to perform her duties with care." *Custard*, 2010 NCBC LEXIS 9, at *52. The business judgment rule only protects directors for "(1) an advertent business decision (2) made by disinterested directors (3) within the scope of their authority (4) in good faith (5) with reasonable care and (6) not for their own self-interests." *Robinson on North Carolina Corporation Law* § 14.06.

66. Here, Plaintiffs have offered substantial evidence that McDowell and Lau were not disinterested and were acting to further their own self-interests in the Grapevine6 transaction. As a result, the Court cannot conclude, as McDowell and Lau urge, that the business judgment rule protects their actions as a matter of law under the standard imposed by Rule 56. Accordingly, the Court must deny Defendants' Motions on this ground.

67. McDowell and Lau's contention that their alleged breach did not cause rFactr injury, however, has more traction. Not only have Plaintiffs failed to offer evidence that the Grapevine6 transaction could have or would have resulted in a sale benefitting rFactr had McDowell and Lau not rejected it, but the undisputed evidence also shows that rFactr did not have the necessary funds and had not procured investors or lenders interested in providing the necessary funds to permit the sale process to go forward in earnest with Grapevine6. In these circumstances—where there is no evidence permitting the inference that a sale to Grapevine6 could have been possible but for McDowell and Lau's self-dealing—Plaintiffs have failed to show

that McDowell's and Lau's alleged breach of fiduciary duty has caused injury to rFactr. As such, Plaintiffs have failed to offer evidence of a necessary element of their claim. *See, e.g.*, *Panzino v. Map Mgmt. of Charlotte LLC*, 2021 NCBC LEXIS 13, at *4 (N.C. Super. Ct. Feb. 12, 2021) ("To state a claim for breach of fiduciary duty, the plaintiff must plead the existence of a fiduciary duty, a breach of that duty, and injury proximately caused by the breach."); *see also, e.g.*, *Meiselman v. Meiselman*, 309 N.C. 279, 310 (1983) (recognizing that "the ability, financial or otherwise, of the corporation to take advantage of [a corporate] opportunity" is relevant in the inquiry of whether a corporate opportunity was usurped).

68. Based on the above, the Court concludes that Plaintiffs' claims for breach of fiduciary duty against McDowell and Lau arising from their actions in connection with rFactr's potential sale to Grapevine6 must be dismissed.[112]

B.   Individual Claims Against McDowell

69. Plaintiffs' direct claims against McDowell for breach of fiduciary duty, constructive fraud, and securities fraud all stem from McDowell's alleged failure to correct three representations Plaintiffs allege Brasser made to them in McDowell's

---

[112] Defendants argue more broadly that Plaintiffs have failed to offer evidence from which a reasonable factfinder could conclude that any actions of Defendants caused rFactr's insolvency and Plaintiffs' loss of their investments, contending that rFactr's IRS tax liability and its resulting collapse after disclosure of the IRS tax liens are the cause of Plaintiffs' loss. (McDowell Br. 25–28; Lau and Dunn Br. 23; McDowell Reply 13–14; Lau and Dunn Reply 9–11.) The Court is not persuaded that such a conclusion is compelled as a matter of law under Rule 56. Not only is "[p]roximate cause . . . ordinarily a question of fact for the jury," *Williams v. Carolina Power & Light Co.*, 296 N.C. 400, 403 (1979) (cleaned up), but "[t]he Court should only decide issues of proximate cause in those cases where reasonable minds could not differ as to the foreseeability of injury," *In re Southeastern Eye Center–Pending Matters*, 2019 NCBC LEXIS 29, at *178 (N.C. Super. Ct. May 7, 2019). Plaintiffs have offered sufficient evidence of proximate cause to permit reasonable minds to differ here.

presence to induce Plaintiffs to purchase promissory notes in rFactr: (i) that rFactr was a new company; (ii) that Plaintiffs' investments would be used as bridge financing to support a new subscription demand; and (iii) that rFactr would be cash flow positive in six months.[113] Plaintiffs also allege that McDowell failed to disclose that he would be paid a finder's fee if Plaintiffs purchased rFactr's promissory notes.[114]

70. McDowell moves to dismiss these claims, contending that the undisputed evidence establishes as a matter of law that he did not owe Plaintiffs a fiduciary duty, that he did not make any affirmative misrepresentations, and that he did not have a duty to correct Brasser's alleged misrepresentations or to disclose any compensation he received for soliciting Plaintiffs' investments.

### 1. Breach of Fiduciary Duty and Constructive Fraud

71. Plaintiffs argue that McDowell owed them a fiduciary duty because he introduced them to Brasser, vouched for Brasser and rFactr, solicited their investments by forwarding to them information about rFactr, represented that he was "actively involved in management oversight" of rFactr, and otherwise induced them to purchase rFactr's promissory notes.[115]

72. "To establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that

---

[113] (Am. Compl. ¶¶ 23–24.)

[114] (Am. Compl. ¶ 27.)

[115] (Resp. 23–24.)

fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019).

73. "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *King v. Bryant*, 369 N.C. 451, 464 (2017) (quoting *Dalton v. Camp*, 353 N.C. 647, 651 (2001)). "[A] fiduciary relationship is generally described as arising when 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.' " *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014) (quoting *Green v. Freeman*, 367 N.C. 136, 141 (2013)). "North Carolina recognizes two types of fiduciary relationships: de jure, or those imposed by operation of law, and de facto, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings, LLC*, 264 N.C. App. 350, 355 (2019).

74. As an initial matter, Plaintiffs conceded at the Hearing that McDowell does not owe Plaintiffs a de jure fiduciary duty based on his role as a broker.[116] This concession is supported by undisputed evidence establishing that McDowell was not a personal broker to Plaintiffs, including Plaintiffs' admissions that they never entered a brokerage contract with McDowell or paid him for services related to their purchase of rFactr promissory notes.[117]

---

[116] (Feb. 16, 2022 Hr'g Tr. 78:24–79:1 [hereinafter "Tr."], ECF No. 140.)

[117] (Kwon Dep. 13:4–14:10, ECF No. 103.1; Lee Dep. 15:14–16:2, ECF No. 103.2.)

75. Instead, Plaintiffs base their fiduciary duty claims on their alleged de facto fiduciary relationship with McDowell. However, "[t]he standard for finding a de facto fiduciary relationship is a demanding one: 'Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen.'" *Lockerman v. S. River Elec. Membership Corp.*, 250 N.C. App. 631, 636 (2016) (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613 (2008)).

76. Rather than address this standard, Plaintiffs argue that McDowell owed them a de facto fiduciary duty under the "special duty" exception recognized by our Supreme Court in *Barger v. McCoy Hillard & Parks*, 346 N.C. 650 (1997).[118] But Plaintiffs misunderstand the concept of "special duty" as used in *Barger*. As Judge Adam M. Conrad of this Court has explained:

> [The phrase "special duty" in *Barger*] comes from precedents dealing with the distinction between individual and derivative suits. Our courts have held that "a shareholder may maintain an individual action against a third party for an injury that directly affects the shareholder, even if the corporation also has a cause of action arising from the same wrong, if the shareholder can show that the wrongdoer owed him a special duty." *Barger*, 346 N.C. at 658–59. A fiduciary duty is an example of a special duty. So is a contractual duty. Other special duties—including "when the wrongful actions of a party induced an individual to become a shareholder"—are neither fiduciary nor contractual, or at least not necessarily so. *Id.* at 659; *see also Howell v. Fisher*, 49 N.C. App. 488, 498 (1980).

---

[118] (Resp. 23.)

*Kixsports, LLC v. Munn*, 2021 NCBC LEXIS 32, at \*37–38 (N.C. Super. Ct. Apr. 1, 2021).

77.  Applying these principles here, the Court concludes that Plaintiffs have failed to offer evidence from which a reasonable factfinder could conclude that McDowell owed them a fiduciary duty. In particular, even if McDowell's activities created a special duty under *Barger*, Plaintiffs have failed to show that any special duty he owed was a fiduciary one. Plaintiffs have neither argued nor offered evidence that McDowell "held all the cards" in his relationship with Plaintiffs or controlled all the information Plaintiffs could or did consider in making their investments in rFactr.

78.  To the contrary, not only were Plaintiffs experienced, highly sophisticated investors and finance professionals who had ample opportunity after the March 2014 dinner to conduct any necessary due diligence prior to making their investments,[119] but the undisputed evidence also shows that they frequently communicated with Brasser and Gentner about rFactr and its finances and operations while they were considering whether to invest.[120]

79.  At most, the undisputed evidence shows that McDowell was a source of information to Plaintiffs, not the central and controlling figure in their investment decision-making. Indeed, Kwon testified that he was satisfied to invest without receiving certain information he had requested from Brasser because he did not want

---

[119] (Kwon Dep. 9:2–22, ECF No. 103.1; Lee Dep. 10:13–12:16, ECF No. 103.2.)

[120] (Kwon Dep. 25:4–18, ECF No. 103.1; Kwon Dep. 30:2–11, ECF No. 125.3; Lee Dep. 33:4–13, ECF No. 103.2.)

to miss out on investing in this round of financing.[121]   In these circumstances, a fiduciary relationship with McDowell has not been shown to exist.[122]  *See, e.g.*, *Howell v. Heafner*, 2020 NCBC LEXIS 105, at *39 (N.C. Super. Ct. Sept. 11, 2020) (finding a de facto fiduciary relationship did not exist where investors failed to show that they "were unable to request and receive more time to consider the [investment] paperwork had they chosen to do so, ask questions about the [documents'] provisions prior to signing, or hold back their signatures until any concerns were satisfied"). Because Plaintiffs' claims for breach of fiduciary duty and constructive fraud both depend upon the existence of a fiduciary relationship, those claims must therefore be dismissed with prejudice.[123]

### 2. Securities Fraud Pursuant to N.C.G.S. § 78A-56(a), Section 10(b) of the Exchange Act, and Rule 10b-5

80.    Plaintiffs have asserted a claim against McDowell for securities fraud under the NCSA and the United States Exchange Act for allegedly making material omissions of fact by failing to disclose his finder's fee and the falsity of Brasser's

---

[121] (Kwon Dep. 32:3–16, ECF No. 103.1.)

[122] Because the Court has determined that McDowell did not have a fiduciary relationship with Plaintiffs, he did not have a fiduciary duty to disclose that he would receive compensation if they chose to invest.  As discussed below, however, the Court concludes that McDowell did have a duty to disclose that information under non-fiduciary principles of North Carolina law.

[123] *See, e.g.*, *Panzino*, 2021 NCBC LEXIS 13, at *4 ("Constructive fraud and breach of fiduciary duty are distinct claims with overlapping elements.  To state a claim for breach of fiduciary duty, the plaintiff must plead the existence of a fiduciary duty, a breach of that duty, and injury proximately caused by the breach.  Constructive fraud requires, as an additional element, that the defendant sought to benefit himself through the breach.") (citations omitted)).

alleged March 2014 misrepresentations in inducing them to purchase rFactr promissory notes.[124] McDowell seeks dismissal, contending that Plaintiffs' claims are barred by the applicable statute of limitations and, in any event, are unsupported by any evidence.[125]

### a. Statute of Limitations

81. The statute of limitations for securities fraud actions is governed by N.C.G.S. § 78A-56(f):

> (f) . . . No person may sue under this section for any other violation of this Chapter more than three years after the person discovers facts constituting the violation, but in any case no later than five years after the sale or contract of sale, *except that if a person who may be liable under this section engages in any fraudulent or deceitful act that conceals the violation* or induces the person to forgo or postpone commencing an action based upon the violation, the suit may be commenced not later than three years after the person discovers or should have discovered that the act was fraudulent or deceitful.

(emphasis added).

82. McDowell argues that Plaintiffs' claim is time-barred because Plaintiffs made their relevant investments in March and April 2014 and did not commence this

---

[124] (*See* Am. Compl. ¶¶107–15.) The parties appear to agree that McDowell need not be the owner of a security to face liability under the NCSA. Indeed, our appellate courts have held that "one who 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' " may be subject to primary liability under North Carolina securities law. *State v. Williams*, 98 N.C. App. 274, 279 (1990) (first alteration in original) (quoting *Pinter v. Dahl*, 486 U.S. 647 (1988)); *see also Skoog v. Harbert Priv. Equity Fund, II, LLC*, 2013 NCBC LEXIS 17, at *12 (N.C. Super. Ct. Mar. 25, 2013) (describing how primary liability is not restricted to the owner of a security).

[125] McDowell argues without opposition from Plaintiffs that there is no evidence showing that he was involved in Lee's second investment in 2015. (McDowell Br. 24–25.) Accordingly, the Court hereby dismisses Plaintiffs' securities claim against McDowell to the extent it is based on Lee's second investment.

action until over five years later in November 2019.[126] McDowell argues further that Brasser's testimony permits a reasonable factfinder to conclude that Plaintiffs were aware of McDowell's fee no later than eighteen months after Plaintiffs' notes were purchased.[127]

83. In response, Plaintiffs contend that their claims are within the three-year tolling period under section 78A-56(f) because McDowell "knowingly concealed material information, and failed to correct material misstatements, which ultimately induced Plaintiffs' investments in rFactr."[128] Plaintiffs assert that they were first made aware that McDowell concealed both the falsity of Brasser's March 2014 representations and his own compensation for inducing their investments when counsel compelled the disclosure of rFactr's financials "at the earliest . . . in June 2017," rendering the November 2019 filing timely.[129] Because the parties offer conflicting evidence concerning when Plaintiffs learned of McDowell's alleged concealment, the Court concludes that McDowell has not carried his burden to show that the securities claim is time-barred as a matter of law. Accordingly, the Court will deny McDowell's Motion on statute of limitations grounds.

---

[126] (McDowell Br. 23–24.)

[127] (Tr. 112:7–13:12.)

[128] (Resp. 25.)

[129] (Resp. 26; Kwon Dep. 51:19–25, ECF No. 125.3.)

*b. Section 78A-56(a)(1)* [130]

84. Under section 78A-56(a)(1), "[a]ny person who[ ] [o]ffers or sells a security in violation of [N.C.]G.S. . . . 78A-8(3)" is subject to civil liability.[131] As provided in N.C.G.S § 78A-8(3): "It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly: . . . (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

85. North Carolina courts have found that section 78A-56(a)(1) corresponds to "federal actions based upon Rule 10b-5 of Section 10(b) of the Securities Act of 1934." *Piazza v. Kirkbride*, 246 N.C. App. 576, 598 (2016); *see Saw Plastic, LLC v. Sturrus*, 2017 NCBC LEXIS 76, at *26 (N.C. Super. Ct. Aug. 25, 2017). This Court has previously summarized the elements for a claim under these provisions as follows:

> [T]he elements of a cause of action under Rule 10b-5[, and § 78A-56(a)(1)] include: (1) the making of a false statement or omission of material fact or the use of a fraudulent device in connection with the

---

[130] Plaintiffs appear to invoke both subsections of 78A-56(a) by broadly arguing that McDowell "knowingly concealed material information, and failed to correct material misstatements," (Resp. 25), citing both section 78A-56, (Am. Compl. 16), and Rule 10b-5, (Am. Compl. 16), in the Amended Complaint. *See Atkinson v. Lackey*, 2015 NCBC LEXIS 21, at *16 (N.C. Super. Ct. Feb. 27, 2015) ("Through N.C.G.S. §§ 78A-56(a)(1) and 78A-56(a)(2), the NCSA 'delineates two different pathways to primary liability.' " (quoting *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, 2013 NCBC 12, at *29 (N.C. Super. Ct. Feb. 19, 2013))).

[131] While the Court recognizes that one who sends an email containing misrepresentations may be liable under section 78A-56(a)(1) as "employ[ing] any device, scheme, or artifice to defraud" or "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[,]" *see Lorenzo v. SEC*, 139 S. Ct. 1094, 1100 (2019), the evidence here shows only that McDowell forwarded a slide deck describing rFactr's product to Lee, (Aff. William M. Butler, Dep. Ex. 22, ECF No. 124.16), and Plaintiffs do not allege that the slide deck contained any misrepresentations or false information.

purchase or sale of any security; (2) made with scienter; (3) upon which the purchaser justifiably relies; and (4) proximate causation.

*Saw Plastic, LLC*, 2017 NCBC LEXIS 76, at *26 (citation omitted). Further, "[a]n action under [N.C.]G.S. § 78A-56(a)(1) 'sounds in fraud, comparable to common law fraud' and 'must include allegations and proof typical of common law fraud claims.' " *Id.* (quoting *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 12, at *30); *see also Brown v. Secor*, 2020 NCBC LEXIS 134, at *29 (N.C. Super. Ct. Nov. 13, 2020) (finding that the Court's rulings as they relate to fraud "apply equally" to a claim under section 78A-56(a)(1)).

86. To prevail on an omission-based securities fraud claim, as Plaintiffs assert here, a plaintiff must allege:

(1) "the relationship [between plaintiff and defendant] giving rise to the duty to speak;" (2) the event that triggered the duty to speak or the general time period over which the relationship arose and the fraud occurred; (3) "the general content of the information that was withheld and the reason for its materiality;" (4) the identity of those under a duty who failed to make such disclosures; (5) what the defendant gained from withholding the information; (6) why the plaintiff's reliance on the omission was reasonable and detrimental; and (7) the damages the fraud caused the plaintiff.

*Island Beyond, LLC v. Prime Cap. Grp., LLC*, 2013 NCBC LEXIS 48, at *18–19 (N.C. Super. Ct. Oct. 30, 2013) (alteration in original) (quoting *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *9 (N.C. Super. Ct. June 18, 2007)). Nevertheless, "North Carolina courts have been loath to impose an obligation of disclosure on commercial parties engaged in business negotiations." *Daniel Grp., Inc. v. Am. Sales & Mktg.*, 2016 NCBC LEXIS 112, at *23 (N.C. Super. Ct. Dec. 15, 2016).

87. Under North Carolina law, a duty to disclose arises when:

> (1) a fiduciary relationship exists between the parties to the transaction; (2) there is no fiduciary relationship and a party has taken affirmative steps to conceal material facts from the other; or (3) there is no fiduciary relationship and one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence.

*In re Southeastern Eye Center–Pending Matters*, 2019 NCBC LEXIS 29, at \*54–55 (cleaned up) (quoting *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696 (2009)). For ease of reference, the Court will refer to these three circumstances as "Scenario 1," "Scenario 2," and "Scenario 3."

88. Here, Plaintiffs argue that "McDowell knowingly concealed material information, and failed to correct material misstatements," thereby inducing Plaintiffs to invest in rFactr.[132]

89. To begin, and as discussed above, McDowell did not owe Plaintiffs a fiduciary duty. As a result, McDowell does not have a duty to disclose under Scenario 1.

90. Next, Plaintiffs do not allege and have failed to offer any evidence that McDowell had a duty to disclose under Scenario 2. Rather than offer evidence of required "affirmative acts," Plaintiffs center their allegations and arguments on McDowell's failure to correct Brasser's representations and to disclose his fee. They identify McDowell's silence as their only evidentiary support for their claim. This is insufficient under North Carolina law to establish a duty to disclose under Scenario 2. *See, e.g.*, *Merrell v. Smith*, 2020 NCBC LEXIS 93, at \*29–30 (N.C. Super. Ct. Dec.

---

[132] (Resp. 25.)

22, 2020) (affirmative acts giving rise to a duty to disclose included defendant giving information to others but not plaintiffs, omitting material information from emails, and concealing information while processing plaintiffs' stock transfer forms); *Vitaform, Inc. v. Aeroflow, Inc.*, 2020 NCBC LEXIS 132, at \*32 (N.C. Super. Ct. Nov. 4, 2020) (finding affirmative steps where defendants entered into business with plaintiff, made representations to plaintiff, and requested trade secret information from plaintiff to compete against plaintiff); *Tillery Envtl. LLC v. A&D Holdings, Inc.*, 2018 NCBC LEXIS 13, at \*24–26 (N.C. Super. Ct. Feb. 9, 2018) (finding duty to disclose where defendant took action "calculated to prevent discovery"); *Shaw v. Gee*, 2016 NCBC LEXIS 103, at \*11–12 (N.C. Super. Ct. Dec. 21, 2016) (requisite affirmative acts included instructing others not to disclose information and making false assurances); *see also United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) ("What is essential is proof of a 'scheme or artifice to defraud,' which can be shown by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter."); *Parsons v. Hornblower & Weeks-Hemphill, Noyes*, 447 F. Supp. 482, 490 (M.D.N.C. 1977) ("We find nothing in Rule 10b-5 that purports to impose liability on anyone whose conduct consists solely of inaction." (quoting *Wessel v. Buhler*, 437 F.2d 279, 283 (9th Cir. 1971))).

91. Finally, Plaintiffs have also failed to offer evidence to show that McDowell had a duty to disclose under Scenario 3.

92. First, as to Brasser's alleged representation that rFactr was a new company, the undisputed evidence shows that Plaintiffs could have learned the truth of rFactr's

corporate status and history with reasonable diligence. Gentner advised Lee that the Company's audited financial statements were "from *our* 2013 Qualified Business Valuation filing for the State of North Carolina,"[133] indicating that the statements were rFactr's, and those statements reflected that the Company had been in business for a number of years. And although Plaintiffs argue that they reasonably believed that the "Targeted Group" reflected in the financial statements was a holding company, not rFactr itself,[134] Lee acknowledged that the Company's use of the name "Targeted Golf Group" would have compelled Plaintiffs to make reasonable inquiry.[135] Nonetheless, it is undisputed that "Targeted Golf" is referenced by name three times in the financial statements,[136] yet Plaintiffs failed to conduct any inquiry to confirm their assumption.

93. In any event, a simple search of public filings on the North Carolina Secretary of State website would have readily revealed that rFactr was an existing, but renamed, company.[137] Plaintiffs' failure to take even this basic step when they had ample time to do so in these circumstances precludes their assertion that they acted with reasonable diligence under North Carolina law. *See, e.g.*, *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346 (1999) (concluding that there was no

---

[133] (Pls.' Production 0000205 (emphasis added).)

[134] (Resp. 4 n.10.)

[135] (Lee Dep. 214:11–13, ECF No. 125.5.)

[136] (Pls.' Production 0000216.)

[137] (rFactr Search Results.)

reasonable reliance where the party failed to review public records); *Brown*, 2020 NCBC LEXIS 134, at \*19 (concluding plaintiff's reliance on defendant's alleged misrepresentation was unreasonable when plaintiff had the opportunity to review public records but failed to do so); *Island Beyond, LLC*, 2013 NCBC LEXIS 48, at \*21 (determining that the plaintiffs did not demonstrate reasonable reliance where they did not allege that they were prevented from accessing public records and the public records would have shown the information that the defendants failed to disclose); *Crockett Cap. Corp. v. Inland Am. Winston Hotels, Inc.*, 2011 NCBC LEXIS 7, at \*72 (N.C. Super. Ct. Feb. 28, 2011) (finding reliance was not reasonable when the party did not review documents in its possession or conduct a title search).

94. In addition, Plaintiffs do not allege or offer evidence that Brasser or Gentner took any action to prevent their inquiry into rFactr's status as a new company or that Plaintiffs had insufficient time to investigate the matter. To the contrary, the undisputed evidence shows that Plaintiffs were provided with sufficient time and access to Brasser and Gentner to ask questions, seek information, and otherwise conduct due diligence for nearly a month before making their investments in rFactr.[138] Brasser and Gentner provided Plaintiffs with written answers to the questions Plaintiffs posed to them by email as well as audited financial statements, and Brasser also spoke with Kwon by telephone.[139] Moreover, Plaintiffs attested in

---

[138] (Lee Dep. 33:4–18, ECF No. 103.2; Kwon Dep. 25:4–25, ECF No. 103.1; Brasser Production 0002141–43, 0002152–54, 0002181–84, 0002189–92; Pls.' Production 0000209–20.)

[139] (Lee Dep. 33:4–18, ECF No. 103.2; Kwon Dep. 25:4–26:06, ECF No. 103.1; Brasser Production 0002141–43, 0002152–54, 0002181–84, 0002189–92; Pls.' Production 0000209–20.)

their purchase agreements that, prior to making their investments, they had "reviewed . . . [the] information regarding the Company and its business, operations, market potential, capitalization, financial condition and prospects, and all other matters [they] deemed relevant,"[140] yet Plaintiffs made no inquiry on this issue, one they now claim was critical to their investment decision.

95.    Because the undisputed evidence shows that Plaintiffs failed to make any reasonable attempt to confirm their belief that rFactr was a new company, the Court concludes as a matter of law that Plaintiffs have failed to show that McDowell had a duty to disclose Brasser's alleged misrepresentations under Scenario 3. *See, e.g.*, *Hardin*, 199 N.C. App. at 697 ("When the parties deal at arms length and one party has full opportunity to make inquiry but neglects to do so and the other party resorted to no artifice which was reasonably calculated to induce the purchaser to forego investigation action in deceit will not lie." (cleaned up)).

96.    Plaintiffs' claims based on Brasser's statements that rFactr would be profitable in six months and that Plaintiffs' investments would be utilized for subscription demand fare no better.  Plaintiffs rely for their support on Brasser's testimony that McDowell was "intimately involved" in Targeted Group[141]—from which they argue McDowell knew or should have known both statements were false. The Court cannot conclude, however, that a reasonable factfinder may permissibly infer from that alleged "intimate involvement" that McDowell knew at the time of

---

[140] (Pls.' Production 0000200; Aff. William J. Farley, III Supp. Defs. Chris Lau and Robert Dunn's Mot. Summ. J., Ex. K at 0000200, ECF No. 114.11; Am. Compl. ¶ 32.)

[141] (Resp. 24; Brasser Dep. 29:23–24, ECF No. 125.1.)

Plaintiffs' investments in 2014—when he was not yet a member of the Board—that rFactr would not be cash flow positive in six months or that the Company had contrary intentions for the proceeds of Plaintiffs' investments. Indeed, Brasser testified that he believed in February 2015 that rFactr could be profitable or cash flow neutral in six months,[142] and it is undisputed that McDowell invested in rFactr in July 2014 and again in June 2015.[143] Viewing this evidence in the light most favorable to Plaintiffs, a reasonable factfinder could not reasonably conclude that McDowell was aware that Brasser had misrepresented material information regarding rFactr's profitability to Plaintiffs and other investors in March 2014.

97. Accordingly, the Court concludes that McDowell's Motion should be granted to the extent Plaintiffs' securities claims are based on McDowell's failure to correct Brasser's three alleged misrepresentations.

98. The Court reaches a different conclusion, however, concerning McDowell's alleged failure to disclose that he would receive compensation should Plaintiffs invest in the Company. Plaintiffs have offered evidence that McDowell was aware that he would receive compensation if Plaintiffs invested, told Plaintiffs about his investment in rFactr, and knew that Plaintiffs thereafter became interested in investing in the Company.[144] Plaintiffs have also offered evidence that McDowell then arranged for

[142] (Brasser Dep. 134:9–24, ECF No. 128.2.)

[143] (Brasser Production 0185335.)

[144] (Brasser Dep. 33:24–39:1, ECF No. 125.1; *see* Lee Dep. 202:14–03:9, ECF No. 125.5; Kwon Dep. 24:10–15, ECF No. 125.3.)

Plaintiffs to meet Brasser,[145] sent investment materials to Plaintiffs,[146] and vouched for Brasser and rFactr,[147] all without disclosing that he would be compensated if Plaintiffs invested in the Company.[148]

99.    Although Plaintiffs could have inquired whether McDowell would receive a fee for their investments, the record evidence does not compel the conclusion that a reasonable investor should have made inquiry of McDowell about a possible fee for obtaining their investment or otherwise suspected that McDowell would be paid should they choose to invest. *See Bucci v. Burns*, 2020 NCBC LEXIS 79, at \*26 (N.C. Super. Ct. June 30, 2020) (finding a jury issue where plaintiffs had no reason to suspect the falsity of a statement about non-public information). Since Plaintiffs have averred that they would not have invested in rFactr had they known that McDowell would be paid if he induced their investments,[149] the Court concludes that, based on this record, McDowell's Motion must fail as to this aspect of Plaintiffs' securities claims.

100.    Based on the foregoing, therefore, the Court concludes that McDowell is entitled to summary judgment on Plaintiffs' securities fraud claims under section

---

[145] (Brasser Production 0002113; Kwon Dep. 24:10–15, ECF No. 103.1.)

[146] (Aff. William M. Butler, Dep. Ex. 22, ECF No. 124.16; Aff. William M. Butler, Dep. Ex. 23, ECF No. 124.17.)

[147] (Lee Dep. 31:16–18, 203:15–17, ECF No. 125.5; Kwon Dep. 28:14–25, ECF No. 125.3.)

[148] (Kwon Dep. 51:17–24, ECF No. 125.3; Lee Dep. 204:5–7, ECF No. 125.5; Brasser Dep. 39:2–40:20, ECF No. 125.1.)

[149] (Am. Compl. ¶¶ 26–27, 93, 113.)

78A-56(a)(1) and Rule 10b-5 to the extent they are based on McDowell's failure to correct Brasser's alleged misrepresentations, but that McDowell's Motion should be denied to the extent Plaintiffs' claims are based on McDowell's alleged failure to disclose that he would receive compensation should Plaintiffs invest in rFactr.

### c. Section 78A-56(a)(2)

101. The Court next considers Plaintiffs' claims against McDowell pursuant to section 78A-56(a)(2).

102. Under section 78A-56(a)(2), civil liability will be imposed on

> [A]ny person who[ ] . . . [o]ffers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission[.]

103. "Section 56(a)(2) parallels § 12(a)(2) of the Federal Securities Act of 1933, and 'cases construing § 12[a](2) should be considered when interpreting § 78A-56[(a)(2)].' " *Skoog*, 2013 NCBC LEXIS 17, at *14 (alterations in original) (quoting *Venturtech II, L.P. v. Deloitte Haskins & Sells*, 790 F. Supp. 576, 588 (E.D.N.C. 1992)). The section "is more akin to a negligence standard than intentional fraud[,]" *Austin v. Regal Inv. Advisors, LLC*, 2018 NCBC LEXIS 3, at *42 (N.C. Super. Ct. Jan. 8, 2018), and "does not additionally require proof of scienter or justifiable reliance[,]" *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC 12, at *37.

104. There is "no general duty of disclosure imposed by either federal or North Carolina securities laws[,]" *Skoog*, 2013 NCBC LEXIS 17, at *15, and disclosure is

required "only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.' " *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (citing 17 C.F.R. § 240.10b-5(b)). Accordingly, when there is no other duty to speak, "[a]n omission must be tied to an affirmative statement[.]" *Skoog*, 2013 NCBC LEXIS 17, at *15 (applying this consideration to section 78A-56(a)(2) claims); *see NNN Durham Office Portfolio 1, LLC*, 2013 NCBC 12, at *36 (noting that section 78A-56(a)(2) does not have a general duty of disclosure and requires an affirmative statement "[l]ike § 56(a)(1)"); *Ragsdale v. Kennedy*, 286 N.C. 130, 139 (1974) ("The rule is that even though a vendor may have no duty to speak under the circumstances, nevertheless if he does assume to speak he must make a full and fair disclosure as to the matters he discusses.").

105. Applying these principles here, and because the Court concludes, as discussed above, that McDowell did not have a duty to disclose that Brasser's alleged misrepresentations were false, Plaintiffs' claims under section 78A-56(a)(2) may only succeed if McDowell's omission can be tied to an affirmative statement, made by McDowell, that was misleading in the circumstances. *See, e.g.*, *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *119 (N.C. Super. Ct. Dec. 31, 2019) ("[O]nly where a seller elects to make a statement regarding a security does the NCSA require that the statement contain sufficient material information to not be misleading."); *see also Worley v. Moore*, 2018 NCBC LEXIS 114, at *20–21 (N.C. Super. Ct. Nov. 2, 2018) (finding that the defendant could not be liable under section 78A-56(b) or section 78A-

8(2) and had no duty to speak where the plaintiff did not assert that the affirmative statements were made by the defendant).

106. Plaintiffs' claims under section 78A-56(a)(2), however, are based on Brasser's alleged misrepresentations, not McDowell's.[150] Although federal courts suggest that omission claims may be based on statements by another if they are adopted or attributed to the defendant, *see e.g.*, *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 889 (W.D.N.C. 2001), there is no evidence of record—certainly no affirmative acts—from which a reasonable factfinder could conclude that McDowell adopted Brasser's statements as his own.

107. As a result, the Court concludes that to the extent that Plaintiffs' claims against McDowell under section 78A-56(a)(2) are based on Brasser's alleged misrepresentations, those claims must be dismissed.[151]

108. The Court again reaches a contrary conclusion under this section concerning Plaintiffs' claims to the extent they are based on McDowell's failure to disclose his fee, and for the same reasons discussed above.

109. Accordingly, the Court concludes that Plaintiffs' claims under section 78A-56(a)(2) should be dismissed to the extent they are based on Brasser's alleged misrepresentations, but that McDowell's Motion should be denied to the extent those

---

[150] (Am. Compl. ¶ 23; Resp. 25.)

[151] Plaintiffs plead at paragraph 110 of the Verified Amended Complaint that "McDowell was involved in and materially aided rFactr's sale of the Notes." (Am. Compl. ¶ 110.) Plaintiffs, however, have not offered evidence or arguments supporting any claim for "aiding and abetting" liability under section 78A-56(c)(2) and thus, to the extent Plaintiffs assert a claim on that theory, that claim is hereby dismissed.

claims are based on McDowell's failure to disclose that he would receive compensation in the event Plaintiffs invested in the Company.

V.

CONCLUSION

110.  **WHEREFORE**, for the reasons set forth above, the Court hereby **ORDERS** as follows:

a.  The Court **GRANTS** the Motions as to Plaintiffs' derivative claims for breach of fiduciary duty based on a duty of oversight and a duty to monitor and those claims are hereby dismissed with prejudice.

b.  The Court **GRANTS** the Motions as to Plaintiffs' derivative claims for breach of fiduciary duty against Lau based on alleged excessive compensation and those claims are hereby dismissed with prejudice.

c.  The Court **DENIES** the Motions as to Plaintiffs' derivative claims for breach of fiduciary duty against McDowell and Dunn based on alleged excessive compensation and those claims shall proceed to trial.

d.  The Court **GRANTS** the Motions as to Plaintiffs' derivative claims for breach of fiduciary duty based on the duty of loyalty regarding rFactr's potential sale to Grapevine6 and those claims are hereby dismissed with prejudice.

e.  The Court **GRANTS** McDowell's Motion as to Plaintiffs' individual claims for breach of fiduciary duty and constructive fraud and those claims are hereby dismissed with prejudice.

f.  The Court **GRANTS** McDowell's Motion as to Plaintiffs' individual claims for securities fraud based on McDowell's failure to correct Brasser's alleged misrepresentations and those claims are hereby dismissed with prejudice.

g.  The Court **DENIES** McDowell's Motion as to Plaintiffs' individual claims for securities fraud (i) to the extent McDowell's Motion is based on statute of limitations grounds, and (ii) as to McDowell's failure to disclose that he would receive compensation if Plaintiffs invested in the Company, and those claims shall proceed to trial, except that to the extent those claims are based on Lee's purchase of a $50,000 rFactr promissory note on 19 March 2015, those claims are hereby dismissed with prejudice.

**SO ORDERED**, this the 26th day of May, 2022.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge